SAN ANTONIO & ARANSAS PASS RAILWAY COMPANY v. HELEN
POLKA ET AL.

Decided November 24, 1909.

**Personal Injuries—Release—Mental Capacity—Mutual Mistake—Evidence.**

Where, in a suit against a railroad company for damages for personal injuries resulting in death, the defendant plead in bar of the action a settlement with and a release by the deceased, and the plaintiff replied that the settlement and release were not binding, (1) because of the mental incapacity of the deceased to understand the transaction, and (2) because the same was made under a mutual mistake as to the gravity and extent of the injuries of deceased, evidence considered and held insufficient to avoid the settlement and release.

Appeal from the District Court of DeWitt County. Tried below before Hon. James C. Wilson.

*Proctor, Vandenberge & Crain,* for appellant.—That the release executed by Polka concluded his wife and child: Thompson v. Ft. Worth & R. G. Ry. Co., 97 Texas, 590; Blount v. Gulf, C. & S. F. Ry. Co., 82 S. W., 305.

That the release is valid and binding: Houston & T. C. Ry. Co. v. McCarty, 94 Texas, 298; Houston & T. C. Ry. Co. v. McCarty, 62 S. W., 106; Quebe v. Gulf, C. & S. F. Ry. Co., 81 S. W., 20; Quebe v. Gulf, C. & S. F. Ry. Co., 77 S. W., 442; Chicago, R. I. & T. Ry. Co. v. Williams, 44 Texas Civ. App., 168; Reagan v. Bruff, 108 S. W., 185; Western Mfg. Co. v. Cotton & Long, 104 S. W., 758.

No brief for appellee.

McMEANS, Associate Justice.—This suit was brought by Helen Polka for herself and as next friend for Helen B. Polka, the minor child of herself and her deceased husband, Fred P. Polka, to recover of the San Antonio & Aransas Pass Railway Company damages growing out of the death of said Fred P. Polka, alleged to have resulted from injuries received by him while in the employment of the railway company. Subsequently to the institution of the suit plaintiff, Helen Polka, was married to J. B. Heffernan, who thereafter made himself a party plaintiff.

A trial before a jury resulted in a verdict and judgment in favor of plaintiffs, Helen Heffernan, formerly Helen Polka, and her said minor child, for $5000, which was by the verdict and judgment apportioned between them. A motion for new trial presented by defendant was overruled, hence this appeal.

In defense of plaintiffs' suit the defendant pleaded and proved the following release executed by the said Fred P. Polka:

"Know all men by these presents, That I, F. Polka, for and in consideration of the sum of forty-five and no /100 dollars to me in hand paid by the San Antonio & Aransas Pass Railway Company, of the State of Texas, have remised, released and forever discharged, and by these presents do for myself, my heirs, executors, administrators and assigns, remise, release and forever discharge the said San Antonio & Aransas Pass Railway Company, its successors and assigns, of and from all and all manner of action or actions, cause or causes of actions, suits, debts, dues, sums of money, claims and demands whatsoever, which I ever had or now have, or which I or my heirs, executors, administrators or assigns can, shall or may have by reason of any damage or personal injury sustained by me on or about 25th September at or near Yoakum; or for any injuries. received or sustained by me at any time or place for which this railway company might under any circumstances be liable; this being intended as a full settlement and compromise of any and all differences or claims which I have or might have against said company at this date, or by reason of any matter, cause or thing whatsoever.

"In testimony whereof, I have hereunto set my hand and seal on this the 16th of October, 1905.

　　　　　　　　　　　　　　　　　　(Signed) F. Polka.

"Witnesses:
　G. B. Goodloe,
　G. S. McElroy."

"Received, October 16, 1905, of San Antonio & Aransas Pass Railway Company, forty-five and no /100 dollars, in full of the above account.

(Signed) F. Polka.

"Witnesses:
  G. B. Goodloe,
  G. S. McElroy."

Appellees, without denying the execution of the release, attacked the binding force of the same upon three grounds, viz.: (1) The mental incapacity of Polka at the time he executed this release to know and understand what he was doing, or to comprehend the nature and legal effect of the release; (2) that he was induced to execute the release by false and fraudulent representations made to him by certain named agents of appellant to the effect that he was not seriously injured and that he would be able to go back to work; and (3) that the release was executed under a mutual mistake upon the part of Polka and the agents of appellant as to the gravity and extent of his injury.

There was no evidence of any fraudulent representations upon the part of the agents of appellant in procuring Polka to sign the release, and that issue was not submitted by the court to the jury. The court, however, submitted the other grounds pleaded by appellees to avoid the release, viz., want of mental capacity and mutual mistake.

Appellant's first assignment of error is as follows:

"The court erred in refusing special charge No. 1, requested by defendant, said special charge being as follows: 'You are instructed that it appearing from the uncontradicted evidence that the deceased, Fred P. Polka, prior to his death, voluntarily executed a written release whereby he fully and completely, for a valuable consideration, released defendant from any and all liability upon or by reason of the causes of action sued upon in this suit, which said release has been read in evidence to you; and it further appearing that it was the intention of the said Polka by the execution of said written release to fully release all causes of action in this cause asserted; and it further appearing from the evidence that at the time of the execution of said release the said Polka was in full possession of his mental faculties, and fully realized and knew what he was doing when he signed said release, and appreciated the effect of his act in signing said release; and it further appearing from the evidence that the said Polka was not induced to execute said release by reason of any fraud or misrepresentation of any of defendant's agents charged therewith by plaintiff herein; and it further appearing that there was no mistake whatever in the execution of said release, that said release under the evidence is a valid and binding release upon the plaintiffs herein, and you will therefore return a verdict for the defendant.'

"Because it appears from the uncontradicted evidence that the deceased, Fred P. Polka, prior to his death voluntarily executed the written release, whereby he fully and completely, for a valuable con-

sideration, released defendant from any and all liability upon or by reason of the causes of action sued upon in this suit, which said release was pleaded by defendant as a defense of this cause, and was introduced in evidence; and because further, it appears from the uncontradicted evidence that at the time of the execution of said release, the said Fred P. Polka was in full possession of his mental faculties, and fully realized and knew what he was doing when he signed said release, and appreciated the effect of his act in signing same; and it further appears from the evidence that the said Fred P. Polka was not induced to execute said release by reason of any fraud or misrepresentation of any of defendant's agents charged therewith by plaintiff herein; and further that there was no mistake whatever in the execution of said release."

By its second assignment appellant contends, in substance, that the verdict and judgment are contrary to the law and the evidence, because from the undisputed evidence it appears that said Polka prior to his death, and for a valuable consideration paid to him by appellant, compromised and settled all claims and causes of action which are asserted by appellees in this suit, which settlement was evidenced by the said written release which was voluntarily executed by Polka without any fraudulent representations upon the part of appellant's agents inducing him to do so; that he had full knowledge of the nature and character of his injuries and had every opportunity to ascertain the nature and extent of same, and that he at said time was in full possession of his mental faculties, knew what he was doing and realized the effect of his act in executing the release. The only testimony offered to prove Polka's want of mental capacity was substantially as follows: The appellee, Helen Heffernan, testified:

"I have testified on direct examination that I was in Yoakum with Fred Polka after he was hurt. I was with him at Yoakum two weeks and then went to San Antonio. I saw him after he went to San Antonio; I spent the day there with him; then I saw him when he came back to Cuero. I noticed a difference in the mental condition of my husband, Fred P. Polka, before and after he received the injury of the 25th of September, 1905. The difference I noticed after the injury was the loss of pride, the loss of self-respect, notice of the child and all such things around the house. Before the injury he took very good care of himself, and after the injury he never took care how he went around, how he looked, or anything else. Before the injury he was never satisfied unless the child was where he was, and after the injury he did not care to have anything to do with it. Before the injury he treated me all right; as a husband he was all right; he was affectionate towards me; but after the injury he was not affectionate at all; he did not care when I would come in the room. At times, after the injury, he would call me, and when I would get into the room and ask him what he wanted, he would say that he never called me. He complained to me that his head continually hurt him, and that he had a knot in the forehead above the nose; he complained of a knot right here above the nose (indicating) on his forehead, the middle

of the forehead. He complained of seeing everything double. He was unconscious in Yoakum from the effects of the blow, for four days. When he came to himself he got up right away. When I went to Yoakum, after the accident, I had the baby up there with me. In Yoakum, half of the time, Fred Polka would not let me bring the baby in the room at all. I did not take the baby with me to San Antonio. When I went to San Antonio to spend the day with him he treated me all right so far. When I spent the day with him in San Antonio he was not as affectionate to me as he had been prior to his injury. His treatment of me when I spent the day with him in San Antonio was not just the same as it had been prior to the injury. I saw Dr. Graves on the day I was in San Antonio. I saw Dr. Graves and Fred Polka together once that day. I saw Dr. Graves at the hospital. I have testified that Fred Polka would call me in the room, and when I got there he would tell me he did not call me; this occurred at Yoakum before he went to San Antonio.

William Burt testified that he saw Fred Polka the day he returned from San Antonio and had a conversation with him with reference to the condition of Polka's vision; that Polka said if he looked at an object long it appeared to be double; that Polka said to him, "When you walked up I knew you when I flashed my eyes on you, and I can look at you a little and you look like two of you." That he turned toward a horse across the street and said, "I can glance at that horse and tell what color he is, and if I look at him a few seconds it looks like there are two horses there."

Alex. Polka testified that he saw Fred Polka after his return from San Antonio and asked him how he felt; that Fred Polka replied that he was not feeling good; that he still had pain in his head and a dull headache all the time; that Fred did not say anything about his eyes; that witness noticed his eye was still bloodshot and blue around it.

It was further shown that Fred Polka was hurt on September 25, 1905, by being struck on the forehead by a rebounding bar of steel; that the outer and inner plates of the skull were fractured and that he was rendered unconscious by the blow and remained in that condition, according to the testimony of the physician who attended him, nine hours, or as testified by Mrs. Polka, four days. He was treated by a physician at Yoakum for about twelve days and was then sent to the Santa Rosa Hospital, at San Antonio, where nearly all the sick and injured employes of appellant are treated. He executed the release pleaded by appellant October 16, 1905; returned from San Antonio to Cuero November 10, and died November 15, 1905.

On the issue of mutual mistake the following evidence was adduced: Walter Napier, claim agent for appellant, testified that being informed that a couple of employes of appellant who were in the hospital wanted to go home, he went out to the hospital and saw Mr. Polka. "Told him my business and that I understood he wanted to go home, and that he wanted to talk settlement. I asked him what he wanted to do. I knew very little about his injuries other than what I had heard. I did not take time to look into the

papers other than to get a mere insight into them. Mr. Polka said he did know, and he said, 'What do you propose to do?' I said, 'Well, that is up to you. Tell me what you think you ought to have in the matter and I will talk to you about it,' and he said, 'I think I ought to have full time.' I then said, 'How are we to arrive at your disability? I do not know whether you are yet able to work or not, and I am willing to allow you full time, provided we can arrive at your disability.' He said he did not know, and I said, 'The only way I know is to leave it to your physician who is attending you;' and he said, 'Very well, that is satisfactory to me.'"

The witness further testified to meeting Polka by agreement at the office of the physician, and that after an examination of Polka by the physician the following conversation took place: "I said, 'Doctor, Mr. Polka and I are trying to agree on a settlement in this matter, and we have agreed to be governed as to his disability by what you have to say in the matter;' and the doctor said, 'Mr. Polka is all right. I see nothing further about Mr. Polka or why he should have any further treatment,' and I said, 'Very well; Mr. Polka, is that satisfactory to you?' and he said, 'All right.'" Soon after they left the physician's office the witness asked: "What do you want to do, Mr. Polka? and he looked at me and said, 'What do you want to do?' and I said, 'The doctor seems to think that you are all right.' It lacked a few days of being a month, about a week, five or six or seven days, and I said to him, 'I am willing to allow you full time for a month, which would be forty-five dollars.' He was getting $1.50 per day, and he says, 'Very well.'" The witness then detailed the circumstances attending the payment of the money to Polka and the signing of the release, and, upon cross-examination, testified:

"With reference to whether or not at the time I made the remark to Fred Polka that 'The doctor seems to think you are all right,' I believed that to be a true statement, and that Fred Polka was all right, and whether at the very time I made the settlement with Polka, on the following Monday, I believed that Fred Polka was not materially hurt or injured, I will say this: There was nothing about Mr. Polka's action, or conduct, or conversation to lead me to believe he was not all right. With reference to whether or not I thought he was all right, when I made the settlement, I do not know that I really thought anything about it. We had left it to Dr. Hughes, as to his disability, and we settled it upon that basis—the information we got from Dr. Hughes. I saw no reason to believe otherwise than that Dr. Hughes' statement that he was all right was correct. With reference to whether or not I would have made the settlement with Fred Polka for forty-five dollars, if I could, if I had not believed the statement that he was all right, I do not know whether I would or not; the case did not come up that way. If I had known that Polka was so badly injured that he was going to die, I would not have settled the whole claim with him for forty-five dollars; I certainly would not have taken that advantage of him. I would not take that advantage of any man. With reference to whether or not, at the time I made the settlement with Polka,

I thought he was not seriously hurt, I do not know that I thought of it once, other than the conversation that took place between Mr. Polka and me at the hospital. He told me that he was willing to accept time, and I told him it would be satisfactory to me, and we agreed as to how we should arrive at his disability, which was by leaving it to his physician, and the information I got from Dr. Hughes led me to believe that I might make the settlement."

It was shown that Dr. Hughes was not in the employment of appellant, but that he treated certain of appellant's employes through courtesy to Dr. Graves, the chief surgeon of appellant. Dr. Hughes testified:

"I remember the circumstance of a meeting in my office between Mr. Fred Polka and Captain Napier, the claim agent of the railroad company, relative to a settlement. Polka came up in the morning, I think it was, possibly just after noon; I do not remember the time of day he came up, and he asked for Captain Napier—asked if Captain Napier had been there—and I said, 'No;' and he said that he (Napier) was to meet him there; and I said, 'I guess he will show up pretty soon; come in and let's see how you are getting along.' Polka then took the chair, and I looked in his eyes and talked to him, and we talked until Captain Napier came in, possibly ten minutes afterwards. When Napier came in, I think he (Napier) asked me what Polka's condition was, and I said, 'He seems to be all right and in good shape; he has been begging me for about a week to go home; he says he feels all right, and I do not see any reason why he should not go;' and Captain Napier said to me, 'Well, do you think you can dismiss him now?' and I said, 'I think I can; I do not see any reason why I should not; I can not find anything more to treat.' To my knowledge there was nothing to treat; I gave him an honest opinion when I told him he was well. I examined him that day; I looked at his eyes, felt around on his head, and asked if there was any tenderness or soreness, and he said no; I would not have dismissed him if I had not thought that he was well."

It may be conceded that the evidence is sufficient to justify a finding that Fred Polka's death resulted from the blow on the forehead.

We think the evidence wholly insufficient to raise the issue of want of mental capacity of Fred Polka at the time he executed the release to know and understand what he was doing, or to comprehend the nature and legal effect of the release. Can the release be set aside or disregarded on the ground that Polka and appellant's agent who settled with him were mistaken as to the gravity and extent of the injury? We have been unable under the facts of this case to distinguish it from that of Houston & T. C. Ry. Co. v. McCarty, 94 Texas, 298. In that case the release pleaded in defense was almost identical with that pleaded in this. In that case the injured party appeared to have sustained no other injury than a dislocation of the ankle, and it was shown by the evidence that no other injuries were considered by the parties to the settlement and no other injuries to the person entered into and formed any part of the consideration for the settlement and that neither the injured person nor the railway company's agent knew or suspected injury

to any other part of the injured man's person, although it was shortly afterwards discovered that he had received injuries which would practically destroy his usefulness for the remainder of his life, and the release was sought to be set aside on the sole ground that both he and the agent of the railway company were mistaken in supposing that he had sustained no other injury than a dislocated ankle. In disposing of the McCarty case Associate Justice Brown, for the Supreme Court, in language so directly applicable to the facts in the present case that we adopt it as our own, says:

"We are unable to see any circumstances in this case to take the release out of the general rule. The appellee, who was plaintiff in the court below, had at least the same knowledge and the same means of obtaining knowledge as the appellant, and if there was no fraud in the transaction, the settlement was binding upon him. That where a party who has a claim against another for personal injuries agrees upon a settlement of his claim and accepts a sum of money or other thing of value in settlement of such claim, he is, in the absence of fraud or concealment, concluded by the settlement, is a proposition sustained, as we think, by the great weight if not an unbroken line of authority. . . ." After citing Lumley v. Wabash Railway, 6 Am. & Eng. Railway Cases (new series) 81, he proceeds: "This case is also clearly to be distinguished from the Lumley case and the other cases on that line. In those cases the contract was neither set aside nor impaired by reason of any mistake of the parties to the release. There, by a rule of construction, the operation of the release is restricted to the particulars mentioned. Here no particular injuries are mentioned. The release is of all damages that have accrued or may accrue to the plaintiff by reason of the accident in which he was injured. Here, then, the terms of the release are not to be mistaken and the contract is not open to construction. In the face of such an instrument it can not be said that all the injuries which might be developed as a result of the accident, whether known or unknown, were not in the contemplation of the parties to the instrument and were not embraced within its terms. In all such cases the damages are ascertainable in a legal sense, but in fact are uncertain in amount. Until the extent of the injuries have been clearly developed, they may be more or less than appearances would indicate, and therefore in every settlement of the character of that under consideration, the parties take the chances of future development—the one of paying more than an adequate compensation for a wrong inflicted, and the other of receiving less."

The opinion concludes thus: "Our opinion is that the release embraces all damages resulting from the injuries of the plaintiff, and that it can not be varied by parol evidence tending to show that other injuries than to the ankle were not in the contemplation of the parties." See also Quebe v. Gulf, C. & S. F. Railway Co., 98 Texas, 6; Chicago, R. I. & T. Ry. Co. v. Williams, 44 Texas Civ. App., 168.

We are of the opinion the assignments should be sustained. As no judgment other than the one in favor of the appellant can be properly rendered under the defenses pleaded and established by

the undisputed evidence, it is ordered that the judgment of the court below be reversed and judgment be here rendered for appellant.

*Reversed and rendered.*

Writ of error refused.